11 CV 1280

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID P. SMITH, APLC, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| BANK OF AMERICA CORPORATION, BRIAN T. MOYNIHAN, KENNETH D. LEWIS, NEIL A. COTTY, JOE L. PRICE, and CRAIG ROSATO, | **Jury Trial Demanded** |
| Defendants. | |

Plaintiff David P. Smith, APLC, by its attorneys, alleges upon personal knowledge with respect to itself, and upon information and belief as to all other allegations based upon, *inter alia*, the investigation of counsel, as follows:

1.     This is a securities class action against Bank of America Corporation ("BofA" or the "Company) and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act"), on behalf of all persons who purchased common stock and options of BofA between May 9, 2007 and October 19, 2010 (the "Class Period") and were damaged thereby.

2.     During the Class Period, BofA concealed from investors that it engaged in "dollar rolling," a practice whereby it would move mortgage-backed securities ("MBS") off its books to another entity, but agree to repurchase the MBS after it reported its quarterly financial statement. Accordingly, BofA classified such transactions as "sales," when in reality the transactions were a form of secured borrowing. Dollar rolling enabled BofA to conceal from investors the true risks that BofA had incurred as a result of its investments in MBS.

3.     BofA also concealed from investors that, in large part due to its July 2008 acquisition of Countrywide Financial Corporation ("Countrywide"), it failed to maintain adequate internal controls regarding the processing of foreclosures, because (1) it did not possess adequate paperwork for many of the loans that it purchased or acquired, which could delay or prevent eventual foreclosures; and (2) it did not have adequate personnel to process their foreclosed loans, so it resorted to the improper and illegal practice of "robo-signing."

4.     As a result of Defendants' false statements, BofA securities traded at inflated levels during the Class Period.  As detailed herein, as the truth was revealed, BofA's stock price dropped, causing damages to Class members.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. Section 78j(b) and Section 78t(a), and Rule 10b-5, 17 C.F.R. Section 240 10b-5, promulgated thereunder by the SEC.

6.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Acts and transactions giving rise to the violations of law complained of herein occurred in this District.

7.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications, and the facilities of national securities exchanges.

## PARTIES

8.    Plaintiff David P. Smith, APLC purchased BofA common stock and options during the Class Period and was damaged thereby.  Plaintiff's Class Period transactions are described in the attached certification.

9.    Defendant BofA is a financial holding company.  On its website, BofA describes itself as "one of the world's largest financial institutions, serving individual consumers, small- and middle-market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk management products and services."  BofA is headquartered in Charlotte, North Carolina, but has branch offices throughout the United States, including New York.

10.    Defendant Brian T. Moynihan was BofA's President and Chief Executive Officer since January 2010.  During 2009, Moynihan served as president of BofA's Consumer and Small Business Banking division.  From December 2008 to January 2009, Moynihan served as General Counsel for BofA. From October 2007 to December 2008, Moynihan served as President, Global Corporate and Investment Banking for BofA.  From April 2004 to October 2007, he served as President, Global Wealth and Investment Management of BofA.  Moynihan has also been a director of BofA since January 2010.

11.    Defendant Kenneth D. Lewis has served as BofA's Chief Executive Officer from April 2001 until January 2009.  He served as BofA's President from January 1999 until April 2004, and from July 2004 until January 2009.  He served as Chairman of BofA's board from January 1999 to April 2004, and from February 2005 until his retirement at the end of 2009.

3

12.     Defendant Neil A. Cotty was named as BofA's interim Chief Financial Officer in February 2010 and has been the Chief Accounting Officer at Bank of America from April 2004 until December 2008, and then from July 2009 to the present.

13.     Defendant Joe L. Price served as BofA's Chief Financial Officer from January 2007 until January 2010.

14.     Defendant Craig Rosato served as BofA's Chief Accounting Officer from December 2008 until July 2009.

15.     Defendants Moynihan, Lewis, Cotty, and Rosato are referred to collectively as the "Individual Defendants."   As senior officers of BofA, they possessed the power and authority to control to contents of BofA's public statements, including SEC filings, press releases, and other communications to investors.  They were provided with copies of the Company's false and misleading reports and press releases described herein, and had the ability to prevent their issuance or correct them.   The Individual Defendants had access to material non-public information, and they knew that the relevant facts described herein were concealed from the public, causing the SEC filings, press releases, and other communications to investors discussed herein to be false and misleading.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class, consisting of all persons who purchased or otherwise acquired BofA common stock and options between January 20, 2010 and October 19, 2010, both dates inclusive, and were damaged thereby.  Excluded from the Class are Defendants, members of the immediate family of the Individual Defendants, any subsidiary or affiliate of BofA and the directors, officers, and employees of BofA or its subsidiaries or affiliates, or any

entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors, and assigns of any excluded person.

17.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds if not thousands of members of the Class located throughout the United States. According to BofA's 2009 Form 10-K, there are currently over ten billion shares of BofA common stock outstanding.  Throughout the Class Period, BofA common stock was actively traded on the NYSE (an open and efficient market) under the symbol "BAC."  Record owners and other members of the Class may be identified from records maintained by BofA and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

18.    Plaintiff's claims are typical of the claims of other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

19.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

20.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the 1934 Act was violated by Defendants;

b.    whether Defendants omitted and/or misrepresented material facts;

5

c.      whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      whether Defendants knew or deliberately disregarded that their statements were false and misleading;

e.      whether the misstatements caused stockholders' loss; and

f.      the extent of damage sustained by Class members and the appropriate measure of damages.

21.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

22.      BofA is a financial holding company that, as described in BofA's Form 10-K, filed with the SEC on February 26, 2010, "is one of the world's largest financial institutions, serving individual consumers, small-and middle-market businesses, large corporations and governments with a full range of banking, investing, asset management and other financial and risk management products and services."   As described, BofA provides "consumer and commercial banking, credit card, mortgage, investment banking and capital markets trading services and investment services." *Id.*

6

A.    **Dollar Rolling**

23.    During most of the Class Period, BofA concealed from investors that it engaged in "dollar rolling," a practice whereby it would move MBS off its books to another entity, but agree to repurchase the MBS after it reported its quarterly financial statement. Accordingly, BofA classified such transactions as "sales," when in reality the transactions were a form of secured borrowing. Dollar rolling enabled BofA to conceal from investors the true risks that BofA had incurred as a result of its investments in MBS.

24.    On April 9, 2010, THE WALL STREET JOURNAL, in an article titled "Big Banks Mask Risk Levels," reported that BofA used dollar rolling to conceal its risk levels:

> Two Bank of America traders bought $40 billion of mortgage-backed securities from clients for one month, while at the same time agreeing to sell the securities back before quarter's end, according to people familiar with the matter. This "roll" trade provided the clients with cash and the bank with fees.
>
> ***
>
> A week later, however, the amount tied to the trade shot up to $60 billion, these people say, before dropping to $25 billion, one of these people said, appearing to some at headquarters that the group had defied the order to cap the trade.

25.    On July 9, 2010, BofA publicly filed a letter that John James, its corporate controller, wrote to the SEC on May 13, 2010, discussing BofA's dollar rolling practices, admitting that BofA wrongly classified many transactions as sales when the were in fact a form of secured borrowing. BofA "dollar rolled" $4.5 billion in 1Q 2007, $1.8 billion in 4Q 2007, $10.7 billion in 3Q 2008, and $573 million in 1Q 2009.

**B.**    <u>Mortgage and Foreclosure Paperwork Issues</u>

26.    Before 2008, BofA was a minor player in the mortgage servicing industry, servicing only four million loans.  That changed on July 1, 2008, when BofA acquired Countrywide and acquired an additional ten million loans.

27.    In large part due to the Countrywide acquisition, by the middle of 2009, BofA had over $30 billion in non-performing loans, and was in the process of trying to foreclose on tens of thousands of properties.  This number had grown to over $35 billion by the middle of 2010.

28.    Many of the loans acquired from Countrywide were of poor quality.  As reported by the WALL STREET JOURNAL, in an October 31, 2010 article titled "BofA Tries to Untangle Files," as of November 2010, more than 85% of the loans which were 60 days late came from Countrywide.

29.    Both Bank of America and Countrywide, were involved in the securitization process, which is a process by which a "pool" of residential mortgage loans is acquired and grouped together, then sold.  However, as the ownership of various loans transferred from one entity to another, including entities outside of BofA, paperwork was misplaced or never completed in the first place, which would create confusion as to which company actually owned which specific loan.  These problems would present themselves if a loan went into foreclosure, and could delay the foreclosure, if not prevent it entirely.

30.    Countrywide's paperwork problems were serious and widespread, and it was customary for Countrywide to retain notes it should have transferred.  For example, according to an opinion dated November 16, 2010 from the Bankruptcy Court for the District of New Jersey, a supervisor and operational team leader for the Litigation Management Department for Bank of America Home Loans Servicing L.P. testified as follows:

As to the location of the note, Ms. DeMartini testified that to her knowledge, the original note never left the possession of Countrywide, and that the original note appears to have been transferred to Countrywide's foreclosure unit, as evidenced by internal FedEx tracking numbers. She also confirmed that the new allonge had not been attached or otherwise affixed to the note. She testified further that it was customary for Countrywide to maintain possession of the original note and related documents.

31.     As noted in a November 19, 2010 article by AMERICAN BANKER, titled "Countrywide Routinely Failed to Send Key Docs to MBS Trustees, B of A Employee Says," Ms. DeMartini's "admission that the lender customarily held on to promissory notes could also undermine the industry's position that document transfers to securitization trust are fundamentally sound."

32.     BofA also engaged in the process known as "robo-signing" whereby banks' employees, or even inexperienced workers contracted by the banks, would "rubber stamp" foreclosure documents without giving them a thorough review. For example, Renee Hertzler, a employee at Bank of America Home Loan Servicing, testified in a February 2010 deposition in a Massachusetts bankruptcy case that she signed 7,000 to 8,000 foreclosure documents a month. "I typically don't read them because of the volume that we sign," Hertzler said. As a result, foreclosures were often pushed through even though if there was insufficient documentation to support foreclosure.

33.     THE WALL STREET JOURNAL, in the October 31, 2010 article titled "BofA Tries to Untangle Files," quoted Susan Segal, chief counsel for Arizona Attorney General Terry Goddard, as stating that BofA had significant problems with the handling of foreclosures, and has "not been able to achieve the standard we would expect of a bank of such sophistication and such resources."

34.     Due to such concerns about the foreclosure process, on October 8, 2010, BofA announced that it was indefinitely halting foreclosures in all 50 states, and was reviewing over 100,000 loans.

35.     On October 13, 2010, attorneys general for all 50 states announced that they would conduct a joint investigation regarding "robo-signers" at several banks, and the flawed paperwork filed to support home foreclosures. BofA's handling of foreclosures could violate the unfair and deceptive trade practices of many states, which carry severe penalties. For example, the Ohio Attorney General has stated that penalties resulting from improper foreclosures could be as much as $25,000 per violation.

36.     On October 16, 2010, the FINANCIAL TIMES reported that the SEC has opened an informal inquiry about the foreclosure practices discussed above. The SEC confirmed, on October 19, 2010, that they were discussing the issue with other regulators.

37.     On October 18, 2010, BofA announced that it was resuming foreclosures in 23 states where court approval was needed to finalize a foreclosure. However, the moratorium was kept in place in the 27 states where court approval was not required.

38.     On October 19, 2010, White House Press Secretary Robert Gibbs confirmed that the Federal Fraud Enforcement Task Force was in the early stages of an investigation into whether banks violated mail or wire fraud laws when they submitted flawed paperwork to federal housing agencies. "As institutions are determining their next steps in addressing these issues, we remain committed to holding accountable any bank that has violated the law," he stated.

C.    **False and Misleading Statements**

39.    On May 9, 2007 BofA filed its Form 10-Q for the first quarter of 2007, signed by Defendant Cotty.  The Form 10-Q represented that net cash provided by financing activities for the first quarter of 2007 was $39.357 billion, and net cash used in operating activities was $19.631 billion.

40.    On March 10, 2008, BofA filed with the SEC its 2007 Form 10-K, signed by Defendants Lewis, Cotty, and Price.  The Form 10-K represented that net cash provided by financing activities for the fourth quarter of 2007 was $103.412 billion, and net cash provided by operating activities was $11.036 billion.

41.    The Form 10-Q for the first quarter of 2007 and the 2007 Form 10-K were false and misleading because BofA concealed from investors that it engaged in "dollar rolling" during the first and/or fourth quarters of 2007.  The practice of dollar rolling caused BofA to issue false numbers regarding net cash provided by operating and financing activities, rendering BofA's consolidated balance sheets and statements of cash flows misleading, ultimately led to a $4.517 billion adjustment for the first quarter of 2007, and a $1.815 billion adjustment for the fourth quarter of 2007.

42.    On July 1, 2008, BofA issued a press release, via PR NEWSWIRE, announcing that it completed its purchase of Countrywide.  The press release touted that "[t]his purchase significantly increases Bank of America's market share in consumer real estate, and as our companies combine, we believe Bank of America will benefit from excellent systems and a broad distribution network that will offer more ways to meet our customers' credit needs."

43.     This press release was false and misleading because, BofA did not obtain "excellent systems" from Countrywide, but rather obtained a deeply flawed MBS portfolio riddled with inadequate paperwork which could delay or prevent eventual foreclosures.

44.     On November 6, 2008, BofA filed with the SEC its Form 10-Q for the third quarter of 2008, signed by Defendant Cotty. The Form 10-Q represented that net cash used in financing activities for the third quarter of 2008 was $46.887 billion and net cash provided by operating activities was $31.276 billion.

45.     The Form 10-Q for the third quarter of 2008 was false and misleading because BofA concealed from investors that it engaged in "dollar rolling" during the third quarter of 2009. The practice of dollar rolling caused BofA to issue false numbers regarding net cash used in financing activities, rendering BofA's consolidated balance sheets and statements of cash flows misleading, ultimately led to a $10.7 billion adjustment for the third quarter of 2008.

46.     On February 27, 2009, BofA filed with SEC its Form 10-K for the fourth quarter and year-end 2008, signed by Defendants Lewis, Price, and Rosato. The Form 10-K provided a discussion of BofA's credit risk management:

> The housing downturn and the financial market disruptions that began in the second half of 2007 have continued to affect the economy and the financial services sector in 2008. The housing downturn and the broader economic slowdown accelerated during the second half of 2008 and negatively impacted the credit quality of both our consumer and commercial portfolios. The depth and breadth of the downturn as well as the resulting impacts on the credit quality of our portfolios remain unclear. However, we expect continued market turbulence and economic uncertainty to continue well into 2009. This will result in higher credit losses and provision for credit losses in future periods.
>
> Credit risk is the risk of loss arising from the inability of a borrower or counterparty to meet its obligations. Credit risk can also arise from operational failures that result in an erroneous advance, commitment or investment of funds. We define the credit exposure to a borrower or counterparty as the loss potential arising from all product classifications including loans and leases, deposit

overdrafts, derivatives, assets held-for-sale and unfunded lending commitments that include loan commitments, letters of credit and financial guarantees.

\*\*\*

In response to the significant deterioration in our consumer real estate portfolio we have implemented initiatives including underwriting changes on newly originated consumer real estate loans which increased the minimum FICO score and reduced the maximum loan-to-value (LTVs) and combined loan-to-values (CLTVs). Additional LTV and CLTV reductions were implemented for higher risk geographies. In our home equity portfolio, we have also reduced unfunded lines on deteriorating accounts with declining equity positions.

47.     This discussion of credit risk management was false and misleading because it failed to reveal the significant risk that (1) BofA did not possess adequate paperwork for many of these nonpeforming loans, which could delay or prevent eventual foreclosures; and (2) BofA did not have adequate personnel to process their foreclosed loans, so it resorted to the improper and illegal practice of "robo-signing."

48.     On May 7, 2009, BofA filed its Form 10-Q for the first quarter of 2009, signed by Defendant Rosato. The Form 10-Q represented that net cash used in financing activities for the first quarter of 2009 was $90.726 billion, and net cash provided by operating activities was $54.8 billion.

49.     The Form 10-Q for the first quarter of 2009 was false and misleading because BofA concealed from investors that it engaged in "dollar rolling" during the first quarter of 2009. The practice of dollar rolling caused BofA to issue false numbers regarding net cash used in financing activities, rendering BofA's consolidated balance sheets and statements of cash flows misleading, ultimately led to a $573 million adjustment for the first quarter of 2009.

50.     On February 26, 2010, BofA filed with SEC its Form 10-K for the fourth quarter and year-end 2009. The Form 10-K, signed by Defendants Moynihan and Cotty, provided a discussion of BofA's credit risk management:

13

The economic recession accelerated in late 2008 and continued to deepen into the first half of 2009 but has shown some signs of stabilization and possible improvement over the second half of the year. Consumers continued to be under financial stress as unemployment and underemployment remained at elevated levels and individuals spent longer periods without work. These factors combined with further reductions in spending by consumers and businesses, continued home price declines and turmoil in sectors of the financial markets continued to negatively impact both the consumer and commercial loan portfolios. During 2009, these conditions drove increases in net charge–offs and nonperforming loans and foreclosed properties as well as higher commercial criticized utilized exposure and reserve increases across most portfolios. The depth, breadth and duration of the economic downturn, as well as the resulting impact on the credit quality of the loan portfolios remain unclear into 2010.

We continue to refine our credit standards to meet the changing economic environment. In our consumer businesses, we have implemented a number of initiatives to mitigate losses. These include increased use of judgmental lending and adjustment of underwriting, and account and line management standards and strategies, including reducing unfunded lines where appropriate. Additionally, we have increased collections, loan modification and customer assistance infrastructures to enhance customer support.

51.     This discussion of credit risk management was false and misleading because it failed to reveal the significant risk that (1) BofA did not possess adequate paperwork for many of these nonpeforming loans, which could delay or prevent eventual foreclosures; and (2) BofA did not have adequate personnel to process their foreclosed loans, so it resorted to the improper and illegal practice of "robo-signing."

52.     On July 9, 2010, BofA publicly filed a letter that John James, its corporate controller, wrote to the SEC on May 13, 2010, discussing BofA's dollar rolling practices, admitting that BofA wrongly classified many transactions as sales when they were in fact a form of secured borrowing.  Mr. James explained that the "dollar rolls were entered into by the business with the intent to reduce the specific unit's balance sheet to meet its internal quarter end limits for balance sheet utilization capacity."  BofA "dollar rolled" $4.5 billion in 1Q 2007, $1.8

billion in 4Q 2007, $10.7 billion in 3Q 2008, and $573 million in 1Q 2009, as demonstrated in the following chart:

| | Q1 2009 | Q3 2008 | Q4 2007 | Q1 2007 |
|---|---|---|---|---|
| **Principal Adjustment** | 573 | 10,702 | 1,815 | 4,517 |
| | | | | |
| **Net cash (used in) provided by operating activities (as originally reported)** | 54,797 | 31,276 | 11,036 | -19,631 |
| **Net cash (used in) provided by operating activities (revised)** | 55,370 | 22,389 | 9,221 | -24,148 |
| **Net cash (used in) provided by financing activities (as originally reported)** | -90,726 | -46,887 | 103,412 | 39,357 |
| **Net cash (used in) provided by financing activities (revised)** | -90,153 | -38,000 | 105,227 | 43,874 |

(numbers are in millions)

53.    On July 16, 2010, BofA issued a press release, via PR NEWSWIRE, announcing its second-quarter 2010 financial results, including net income of $3.1 billion. The press release quoted Defendant Moynihan, who stated that the results showed "that we are making progress on our strategy to align around our three core customer groups - consumers, businesses, and institutional investors - and create the financial institution that customers tell us they want, built on a broad relationship of clarity, transparency, and helping them manage through challenging times." He went on to state that "[w]e improved our capital foundation through retained earnings, and credit quality improved even faster than expected. We have the most complete financial franchise in the world, and we are focused on executing our strategy and delivering outstanding long-term value to our customers and shareholders."

54.    That same day, BofA held a public conference call, where Defendant Moynihan stated that BofA's "credit quality continues to improve, in some cases faster than we anticipated

as we came into this year." He also stated that "we're devoting a ton of effort and expense to working through defaults, short sales and modifications, and we're attempting to help every customer we can. In spite of all that hard work, we'll continue to see elevated foreclosures, short sales and other liquidations for the next several quarters as we clean up the legacy Countrywide portfolio."

55.     That day, BofA's stock price dropped from $15.31 to $13.98, trading on high volume.

56.     The above press release and conference call were false and misleading because while they stated that credit quality was improving and they were "working through defaults, short sales and modifications" while attempting to "clean up the legacy Countrywide portfolio," they failed to reveal that BofA did not possess adequate paperwork for many of the loans that it purchased or acquired, which could delay or prevent eventual foreclosures; and (2) BofA did not have adequate personnel to process their foreclosed loans, so it resorted to the improper and illegal practice of "robo-signing."

57.     On October 8, 2010, BofA announced that it was indefinitely halting foreclosures in all 50 states and was reviewing over 100,000 loans. That day, the stock price dropped to $13.18 from $13.31 the day before.

58.     On October 13, 2010, attorneys general for all 50 states announced that they would conduct a joint investigation regarding "robo-signers" at several banks, and the flawed paperwork filed to support home foreclosures. BofA's handling of foreclosures could violate the unfair and deceptive trade practices of many states, which carry severe penalties. For example, the Ohio Attorney General has stated that penalties resulting from improper foreclosures could be as much as $25,000 per violation.

16

59.     On October 16, 2010, the FINANCIAL TIMES reported that the SEC has opened an informal probe into the foreclosure issues described herein.

60.     On October 19, 2010, BofA issued a press release, via PR NEWSWIRE, announcing its third-quarter 2010 financial results, and reporting a net loss of $7.3 billion.  The press release also revealed that net income on a fully taxable-equivalent basis was down 4% from the previous quarter, presumably due in significant part to the problems that BofA was having in effectuating foreclosures.  That day, the SEC also confirmed that they were discussing a possible probe of foreclosure issues with other regulators.  On October 19, 2010, BofA's stock price dropped from $12.34 to $11.80, trading on high volume.  Between October 8 and October 19, the stock dropped from $13.31 to $11.80, a drop of 11.3%.

## COUNT I

### Pursuant to § 10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

a.     employed devices, schemes and artifices to defraud;

b.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

17

c.      engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of BofA common stock and/or options during the Class Period.

64.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BofA common stock and options. Plaintiff and the Class would not have purchased BofA common stock and options at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements. Moreover, at the end of the Class Period, the price of BofA dropped when the artificial inflation was removed from the stock price. As a result, investors during the Class Period could no longer recover the artificial inflation.

## COUNT II

### Pursuant to § 20(a) of the 1934 Act
### Against The Individual Defendants

65.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.      The Individual Defendants acted as controlling persons of BofA within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of BofA, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's press releases alleged by Plaintiff to be misleading prior to and/or shortly after these

18

statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

68.     Furthermore, by engaging in the conduct alleged above, the Individual Defendants culpably participated in the fraud alleged above, directly and/or indirectly causing the investors' losses.

69.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the 1934 Act jointly and severally with BofA for BofA's violation of Section 10(b) and Rule 10b-5.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiff and the other members of the Class damages, including interest;

C.     Awarding Plaintiff and the other members of the Class reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

February 24, 2011

**MURRAY, FRANK & SAILER LLP**

_Gregory Linkh_

Brian P. Murray (BP 9954)
Gregory B. Linkh (GL 0477)
275 Madison Avenue, 8th Floor
New York, New York 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892
bmurray@murrayfrank.com
glinkh@murrayfrank.com

**Counsel for Plaintiff David P. Smith APLC**

20

## PLAINTIFF'S CERTIFICATION

I, David P. Smith, on behalf of David P. Smith, APLC, do hereby certify that:

1. I have reviewed the complaint and have authorized its filing.

2. David P. Smith, APLC purchased securities of Bank of America Corporation, which are the subject of the complaint, *but not* at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

3. David P. Smith, APLC is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the three year period prior to the date of this certification, neither myself nor David P. Smith, APLC has sought to serve or served as a representative party on behalf of a class in an action brought under the federal securities laws.

5. During the Class Period, May 9, 2007 and October 19, 2010, inclusive, David P. Smith, APLC engaged in the following transactions in Bank of America Corporation securities and options:

Please see attached Exhibit A.

6. Neither David P. Smith, APLC nor myself will accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and my activities in the lawsuit, as ordered or approved by the Court.

7. Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

8. I certify under penalty of perjury that the foregoing is true and correct.

Executed on February 23, 2011          Completed by (Print Name): _David P. Smith, President_

                                       Signature: _David P. Smith, President_

**Exhibit A**

**Securities and Options Transactions For David P. Smith, APLC**

| Transaction | Settlement Date | Type | Amount | Price |
|---|---|---|---|---|
| Purchase | 18-Sep-09 | Common Stock | 10,000 | $16.86 |
| Purchase | 4-Feb-10 | Call VED 20 PKG 85 BAC + $13.71 EXP 1/22/11 | 100 | $32.00 |
| Sale | 8-Apr-10 | Call VED 20 PKG 85 BAC + $13.71 EXP 1/22/11 | 100 | $60.00 |
| Purchase | 19-May-10 | Call BAC 20 BAC EXP 1/22/11 | 100 | $100.00 |
| Sale | 18-Dec-10 | Call BAC 20 BAC EXP 1/22/11 | 100 | $1.00 |
| Purchase | 22-Apr-10 | Call BAC 15 BAC EXP 1/21/12 | 50 | $560.00 |
| Purchase | 7-May-10 | Call BAC 12.5 BAC EXP 1/21/12 | 50 | $590.00 |
| Sale | 9-Apr-10 | Call BYP 19 BAC EXP 4/17/10 | 100 | $25.00 |